Benjamin Galdston
BERGER MONTAGUE PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel: (619) 489-0300
bgaldston@bm.net

Michael Dell'Angelo
Barbara A. Podell
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
bpodell@bm.net

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLAKE E. ALLRED AND MELISSA M. ALLRED,<br><br>Plaintiffs,<br><br>v.<br><br>CHICAGO TITLE COMPANY; CHICAGO TITLE INSURANCE COMPANY; ADELLE E. DUCHARME; BETTY ELIXMAN; GINA CHAMPION-CAIN; JOELLE HANSON; CRIS TORRES; RACHAEL BOND; AND DOES 1-10, inclusive,<br><br>Defendants. | Case No.: **'19 CV 2129 WQH MDD**<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

# **TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION ...............................................................1

II.   THE PARTIES ...................................................................7

    A.    Plaintiffs.....................................................................7

    B.    Defendants .................................................................7

III.  JURISDICTION AND VENUE .........................................10

IV.   COMMON FACTUAL ALLEGATIONS ..........................10

    A.    Defendants' Liquor License Lending Scheme .....................10

    B.    The True Nature Of The Lending Platform Scheme............20

    C.    Chicago Title Was Complicit In The Lending Platform Scheme ........22

        1.    Chicago Title Had Actual Knowledge Of, And Participated In, The Scheme Through Its Agents ................22

        2.    Chicago Title, DuCharme, And Elixman Profited From The Lending Platform Fraud ................27

V.    CLASS ACTION ALLEGATIONS..................................29

VI.   CAUSES OF ACTION......................................................31

FIRST CAUSE OF ACTION
Violation of the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(c) Against All Defendants ..................................31

SECOND CAUSE OF ACTION
RICO Conspiracy Violation of 18 U.S.C. § 1962(d) Against All Defendants ..........................................35

THIRD CAUSE OF ACTION
Violation of California Business and Professions Code Section 17200, *et seq.*, Against Chicago Title, DuCharme and Elixman ...................37

FOURTH CAUSE OF ACTION
Aiding and Abetting Fraud
Against Chicago Title, DuCharme, Elixman, Hanson, Torres and Bond .....38

FIFTH CAUSE OF ACTION
Breach of Fiduciary Duty
Against Chicago Title, DuCharme and Elixman...........................................40

SIXTH CAUSE OF ACTION
Negligence Against Chicago Title, DuCharme and Elixman.......................41

VII.   PRAYER FOR RELIEF ....................................................................42

VIII.  DEMAND FOR JURY TRIAL ...................................................42

Plaintiffs, by and through their counsel, bring this action as a class action on behalf of themselves and all others similarly situated who have suffered harm as a result of Defendants' fraudulent liquor license escrow investment conspiracy. Plaintiffs allege the following based upon information and belief, the investigation of their counsel, including interviews with former employees of Defendants, and personal knowledge as to the allegations pertaining to them.

## I.   **INTRODUCTION**

> *"Our agents act as a disinterest [sic] third party who follows the instructions of the principals. Their wealth of technical experience and knowledge of how to keep track of all the transaction details is your assurance of a smooth closing. Chicago Title's escrow settlement agents get the job done with efficiency and accuracy."*

-Chicago Title website

1.      Beginning in 2012 and continuing until September 2019, Defendants defrauded Plaintiffs and other investors of hundreds of millions of dollars in an elaborate Ponzi scheme in which Defendants falsely represented that Plaintiffs' investment funds were being used to make high-interest short-term loans to California liquor license applicants through a special lending "program" or "platform" (the "Lending Platform").  Defendants repeatedly reassured Plaintiffs and other investors that their funds were secure because they were being safeguarded by Chicago Title, a household name and trusted fiduciary, and held in special California liquor license escrow accounts. Indeed, Chicago Title touted these same "Special Escrow" services prominently on its website: "We pride ourselves in the fact that we are a full service company with the ability to provide services in many related areas," ***including liquor license transfer transactions***, and that "***[o]nly very competent, experienced escrow officers handle these transactions***."

2.      A Lending Platform investment "overview" touted that "[t]he escrow company being used in these transactions [Chicago Title] is a very large, well-

known, nationwide Title/Escrow provider, and the funds are kept in the individual license escrow until that application has been approved by the CA ABC [California Department of Alcoholic Beverage Control]."  Other promotional materials assured investors: "We believe that *any risks* associated with these activities *are exclusively borne by Chicago Title* . . . . not by any of the funding sources such as the Platform."

3.     The Lending Platform supposedly operated as follows: Investors were told that applicants for the grant or transfer of California liquor licenses are required to deposit the amount of the ABC license fee in escrow until the application is approved, pursuant to California Business and Professions Code Section 24074. "On a monthly basis, the Platform receives list(s) from the lawyers as to those Applicant clients that want the Platform to fund their license escrow.  At such time that the Platform funds the escrow, Chicago Title Company will notify the ABC that Applicant's money is in escrow and will provide to the ABC a 'Statement RE: Consideration Deposited in Escrow' (form ABC-226), signed by BOTH [Chicago Title] escrow officer and the Applicant indicating that the funds required are in place. This allows the State to continue processing the Applicant's license application."

4.     If the application was approved, the license applicant purportedly would wire money necessary to pay the ABC application fee (to take the place of the Lending Platform bridge loan) and also wire to Chicago Title interest amounts as high as 18% or more owed to the Platform investors, who could elect to cash out or roll their investment back into the Lending Platform to fund new applications. Alternatively, if the application was denied, Platform investors would receive no interest payments. Since Plaintiffs and other investors were told their money would never leave the Chicago Title escrow, their only risk supposedly was the "opportunity cost" of a denied application.

5.     Indeed, the Lending Platform's key feature was that investor funds would be held in secure escrows with a highly regarded financial institution and

experienced fiduciary – *i.e.*, Chicago Title – and could not be disbursed to any party other than the investor, which guaranteed that the investor's principal would be safely returned, at a minimum.  In reliance on Defendants' representations, Plaintiffs and the Class deposited funds into the Chicago Title account through wire transfer, mail, and other transmission means.

6.      However, as first revealed in a complaint filed by the U.S. Securities and Exchange Commission ("SEC") on August 28, 2019, not a single investor dollar was used to fund any liquor license application escrows.  In fact, none of the Chicago Title escrow accounts used by Defendants to misappropriate investor monies were suitable for the transfer of California liquor licenses, which under California law require special escrows administered by qualified escrow agents who are knowledgeable about California law and ABC procedures.

7.      Instead of funding liquor license transfer escrows, the scheme's mastermind, Defendant Gina Champion-Cain ("Champion-Cain") through her company, ANI Development, LLC ("ANI Development"), and with the assistance of the other Defendants, misused investors' funds for personal uses and to subsidize Champion-Cain's vast array of businesses, including approximately 60 restaurants, coffee shops, "lifestyle" brands, retail establishments, properties, and commercial developments.  Champion-Cain also used subsequent investor contributions to pay off earlier investors and, in this way, perpetuate the scheme for at least seven years.

8.      The lynchpin of the scheme and the key to its success was Defendant Chicago Title.  Chicago Title's reputation and standing as a secure financial institution and experienced fiduciary, as well as representations by Chicago Title's two agents in charge of the escrow accounts, Defendants DuCharme and Elixman, assured investors that their funds were secure.  For example, these Chicago Title representatives met with investors and provided purported lists of liquor license applications, and received telephone and email inquiries from investors, which they

dutifully forwarded to Champion-Cain to defuse or deflect. For their assistance in the scheme, the two Chicago Title escrow officers were handsomely rewarded. DuCharme and Elixman accepted at least $29,000 in "gifts" and thousands of dollars in gratuities from Champion-Cain, such as lavish meals, airfare, Padres baseball tickets, and outings paid for by Champion-Cain.

9.     Chicago Title cannot disclaim its actual knowledge of, and participation in, the Lending Platform scheme. At all times, DuCharme and Elixman—longtime Chicago Title employees for 22 years and 11 years, respectively—acted in their capacities as Senior Commercial Escrow Officers at Chicago Title.

10.    Moreover, the very nature of the ANI escrow account provided Chicago Title with knowledge of its fraudulent nature.

11.    Ordinarily, an escrow is a financial arrangement where a third party holds and regulates payment of the funds required for two or more parties involved in a given transaction – typically, a real estate purchase and sale – for a limited duration. The escrow makes transactions more secure by keeping the payment in an independent account administered by an experienced fiduciary who releases funds only when the parties agree that all terms of an agreement are satisfied.

12.    Here, unknown to investors, the Lending Platform "Master" escrow account administered by Chicago Title had all the hallmarks of a criminal enterprise. Unlike a typical multi-party escrow that is created for a specific transaction, subject to detailed instructions, and for a limited duration, Defendants created an open-ended *depository* account at Chicago Title that received hundreds of millions of dollars from scores of third parties over a seven-year period.  Only Champion-Cain and ANI had the exclusive ability to withdraw money at any time and for any reason, while generating substantial revenue for Chicago Title.  In short, the account appeared to serve no commercially sensible purpose other than to ensure a constant, unfettered flow of money to Champion-Cain.  Moreover, these activities took place

in California, historically a hotbed of escrow fraud, and within minutes of the Mexican border, a notorious drug- and human-trafficking route.

13.     Undoubtedly, Chicago Title maintains internal controls to prevent fraud, such as auditing significant accounts, monitoring agent-client relationships, or periodically rotating agents to prevent them from becoming beholden to certain clients or conspiring in criminal enterprises such as this one. Chicago Title's internal Code of Business Conduct & Ethics *requires* every employee to report any actual or suspected illegal or unethical conduct and provides a fraud and ethics hotline phone number at the bottom of each page. The Code states that all employees are expected to be vigilant in discovering evidence of possible fraud or material misrepresentation, *including any misuse of or irregularity in handling and reporting escrow funds* by any agent of Chicago Title. Indeed, according to one former San Diego-area Chicago Title escrow officer who worked for the company from November 2013 to 2014 and was interviewed in connection with Plaintiffs' counsel's investigation, Chicago Title employees were required to report suspicious activity *only to an internal Chicago Title security team*, which would decide whether to report the activity to law enforcement or government agencies. "We were told to *never* contact authorities," the former employee said.

14.     Over the approximately seven-year scheme, Chicago Title reaped hundreds of thousands, if not millions, of dollars in fees, commissions, interest and other compensation from the Lending Platform and other accounts controlled by Champion-Cain and ANI yet Chicago Title and its agents failed to notify investors or law enforcement authorities of the fraud. Instead, DuCharme and Elixman acting under authority and as agents of Chicago Title, deceived and defrauded investors, including providing investors with lists of supposed liquor license applicants eligible for investment and ratifying known forged escrow agreements. The inescapable conclusion is that Chicago Title and its agents had actual knowledge of the fraud.

15.   The criminal enterprise netted Defendants millions of dollars in unlawful gains.  In particular, Chicago Title is believed to have received at least $1,000 for every escrow it was represented to have established and $500 each time Champion-Cain withdrew money from the main Chicago Title escrow account, identified as Chicago Title Escrow Acct. No.  ##2122. Additionally, Chicago Title, earned significant commissions and fees in connection with providing escrow and title insurance services in connection with Champion-Cain's other unauthorized transactions funded with Plaintiffs' money.  DuCharme and Elixman likewise reaped commissions, bonuses and other compensation and benefits as the top Chicago Title escrow officers responsible for hundreds of millions of dollars of business from Champion-Cain and ANI.  Defendants DuCharme and Elixman also received "gifts" totaling at least $29,000 from Champion-Cain, as well as gratuities worth thousands of dollars in the form of free meals, alcohol, air travel, Padres baseball tickets, and lavish social events hosted by Champion-Cain and ANI, in exchange for Chicago Title's assistance in the scheme.

16.   In this action, Plaintiffs and the Class seek to recover their substantial losses and other harms caused by Defendants' fraud and conspiracy in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Section 1962, and violations of California statutory and common law.  Plaintiffs seek damages and equitable relief on behalf of themselves and the Class, including, but not limited to: treble their monetary damages; restitution; punitive damages; costs and expenses, including attorneys' and expert fees; interest; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the Class.

## II.   THE PARTIES

### A.   Plaintiffs

17.   Plaintiff Blake E. Allred is, and was at all relevant times, an individual residing in Fillmore, California, and is a citizen of the State of California.

18.   Plaintiff Brandy M. Allred is, and was at all relevant times, an individual residing in Fillmore, California, and is a citizen of the State of California.

19.   Plaintiffs Blake E. Allred and Brandy M. Allred (collectively, "Allred Plaintiffs") are, and at all relevant times were, a married couple who invested jointly in the ANI Lending Platform.

20.   The Allred Plaintiffs jointly invested $125,000 in the ANI Lending Platform on or about October 18, 2018.

### B.   Defendants

21.   Chicago Title Company is, and at all relevant times was, a California corporation with its principal place of business in Los Angeles, California. Together with Chicago Title Insurance Company, it provides various real estate-related financial services, including escrow agent services.

22.   Chicago Title Insurance Company is, and at all relevant times was, a Florida Corporation with its principal place of business in Jacksonville, Florida. Together with Chicago Title Company, it provides various real estate-related financial services, including escrow agent services.

23.   Chicago Title Company and Chicago Title Insurance Company (collectively, "Chicago Title") are agents, alter egos, and instrumentalities of one another. They are under common ownership. They share the same officers and use the same or interconnected websites on the Internet. In connection with the acts stated herein, Chicago Title Company and Chicago Title Insurance Company operated in a consolidated manner whereby a member of the general public dealing with Chicago Title would be unable to ascertain which specific entity he, she, or it

was doing business with. Recognizing the corporate separateness between these companies would sanction fraud and render injustice on Plaintiffs and the Class.

24.     Defendant Adelle ("Della") E. DuCharme is, and at all relevant times was, an individual residing in San Diego, California, and a resident of the State of California.  At all relevant times, DuCharme was employed as a Senior Commercial Escrow Officer at Chicago Title's San Diego office.

25.     Defendant Betty Elixman is, and at all relevant times was, an individual residing in San Diego, California, and a resident of the State of California.  At all relevant times, Elixman was employed as a Senior Commercial Escrow Officer at Chicago Title's San Diego office.

26.     Defendant Gina Champion-Cain is, and at all relevant times was, an individual residing in San Diego, California, and a resident of the State of California. Champion-Cain is, and at all relevant times was, the sole and managing member of ANI Development, a California limited liability company.  ANI Development is, and at all relevant times was, an affiliate of American National Investments, Inc. ("ANI"), a California corporation based in San Diego, California.  Plaintiffs are further informed and believe and thereon allege that Champion-Cain is, and at all relevant times was, the founder and CEO of ANI.

27.     Defendant Cris Torres ("Torres") is, and at all relevant times was, an individual residing in San Diego, California, and a resident of the State of California. Torres was at all relevant times an employee and the Chief Financial Officer of ANI.

28.     Defendant Joelle Hanson ("Hanson") is, and at all relevant times was, an individual residing in San Diego, California, and a resident of the State of California.  Hanson was at all relevant times an employee of ANI Development and/or ANI, and an Executive Assistant to Defendant Champion-Cain.

29.    Defendant Rachael Bond ("Bond") is, and all relevant times was, an individual residing in San Diego, California, and a resident of the State of California. Bond was at all relevant times employed as an Executive Assistant at ANI.

30.    The Defendants, and each of them, were and/or are the agents, employees, joint venturers, partners, alter egos, or successors in interest of the other Defendants, and in doing the things alleged in the Complaint were acting in the course and scope of their authority in such capacities, with the knowledge, permission, consent, authorization or ratification of the other Defendants, and each of them.

31.    The true names and capacities of the defendants identified as DOES 1 through 10 are unknown. Plaintiffs will amend this Complaint to identify these unnamed defendants when their identities are discovered.  Plaintiffs are informed and believe that each of the DOE defendants has participated in the wrongful acts alleged in this Complaint.

32.    ANI Development and ANI are believed to be co-conspirators and members of the illicit enterprise alleged here but are not named as defendants in this action in accordance with the September 3, 2019 Preliminary Injunction Order in the action captioned *Securities and Exchange Commission v. Gina Champion-Cain and ANI Development, LLC, et al.*, No. 19-cv-1628-LAB-AHG (S.D. Cal.).  Plaintiffs reserve all rights to name ANI Development and ANI as defendants in this action.

33.    Because investigation and discovery are ongoing, Plaintiffs plead each allegation, cause of action, claim and remedy in this Complaint without prejudice to any contradictory current, subsequent or previous allegation, claim or remedy after the true and correct facts have been discovered, pleaded and proven and/or Plaintiffs have expressly elected among alternate remedies.  Plaintiffs' pleading or omission of any alternate theory, cause of action or remedy shall not constitute an election of

one or more theories, claims or remedies over, in place of, or to the exclusion of any other cause of action or remedy.

### III.  JURISDICTION AND VENUE

34.  This Court has subject matter jurisdiction under 18 U.S.C. § 1964 and 28 U.S.C. § 1331.

35.  Venue in this district is proper under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), (c) and (d) in that each Defendant can be found or transacted business in this District and a substantial part of the events alleged herein occurred in this District.

36.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

### IV.  COMMON FACTUAL ALLEGATIONS

#### A.  Defendants' Liquor License Lending Scheme

37.  Beginning in approximately 2012, Defendant Champion-Cain, together with the co-conspirator Defendants, began marketing the liquor license Lending Platform to Plaintiffs and other investors.  To date, Champion-Cain and ANI raised over $300 million, including over $100 million in 2019 alone. When raising those investor funds, Defendants claimed to be offering investors an opportunity to make short-term, high-interest loans to parties seeking to acquire California liquor licenses.  In truth, no loans were made to any liquor license applicants.  Instead, Plaintiffs' and other investors' funds were used without their knowledge or authorization to benefit the Defendants.

38.  Under California state law, liquor license applicants are required to escrow an amount equal to the license purchase price while their application remains pending with the ABC.  Champion-Cain told investors that this regulatory

requirement presented an investment opportunity. As explained in promotional materials (emphasis below original) distributed to prospective investors:

> Prior to the ABC beginning its thorough review of [a license application], there must be an escrow established to transfer/buy the license and the applicant/buyer must deposit the **entire purchase price** of the license into that escrow . . . . [A]n individual buyer/small group that is counting on a Bank/SBA loan, Crowdfunding, or other eventual source of their funds, may not have these funds available in the beginning to place into escrow for 8-10 months.

39.    Champion-Cain went on to assure investors that "[t]he license applicant/prospective buyer does not get to use or have access to the funds, as the named escrow holder is our Fund . . . . After approval by the ABC, the license buyer/applicant or their Bank/SBA Lender, then replaces our funds with their own, plus the fee earned by our Fund, typically 15%."

40.    Critically, investors were told "[t]he escrow company being used in these transactions [Chicago Title] is a very large, well-known, nationwide Title/Escrow provider, and the funds are kept in the individual license escrow until that application has been approved by the CA ABC."

41.    Investors also received a schematic diagram showing Chicago Title as holder of the "Master Escrow Account" for the Lending Platform:



42.    A 2017 private placement offering memorandum for the California Opportunity License Fund, LLC, established by Champion-Cain and ANI, similarly explained the Lending Platform:

> The LLC engages in a unique form of lending. Its typical borrower is an individual attempting to purchase a business with a liquor license issued by the California Bureau of Alcoholic Beverage Control. Section 24074 of the California Business and Professions Code requires that a purchaser of such a business deposit the entire purchase price into a public escrow pending the approval of the ABC to the transfer of the liquor license. The process typically takes 6 to 10 months. The LLC protects its investment by taking over the position of the buyer in the purchase escrow, thereby controlling the proceeds of its own loan. Buyers/borrowers are first vetted by the attorneys that will handle the

liquor license transfer and a recommendation is made to the LLC to fund the escrow. When the transfer is approved by the ABC the actual buyer substitutes his or her funds for those of the LLC and the LLC's funds are returned to it together with a fee, typically 15% of the amount lent. Upon substitution of the buyer's funds, the LLC assigns its position in the escrow to the actual buyer. If for any reason the buyer fails to substitute his or her funds, the LLC will cancel the escrow and receive a refund of the deposit. If the ABC denies the transfer, the LLC's money is returned to it, typically without payment of any fee by the borrower/buyer.

43.     Champion-Cain instructed investors to deposit their money into the "Master Account" maintained by Chicago Title. She also provided investors with a purported list of pending applications, from which investors could choose the liquor license application(s) that they wished to fund. Champion-Cain represented to investors that their funds were being loaned to fund those selected liquor license applications. She also provided investors with escrow agreements, ostensibly executed between ANI and Chicago Title, which provided that investors' principal would be kept safe in an escrow account, and that once the underlying liquor license application was granted, investors' funds would be returned with simple interest as high as 18% or more.

44.     Chicago Title also knowing and intentionally facilitated the fraudulent scheme through representations and omissions by its agents, including DuCharme and Elixman. For example, one Lending Platform investor interviewed in connection with Plaintiffs' counsel's investigation reported personally visiting Chicago Title's downtown San Diego office in approximately 2017. The investor asked to speak with the escrow agent(s) responsible for the "ANI License Fund Accounts" and was directed to Defendant Elixman. The investor told Elixman that he was researching a potential investment in the ANI Lending Platform. Elixman told the investor that Chicago Title received money via wire from investors, which was deposited into the "license fund" at Chicago Title. The investor asked if there

were separate escrows for each ABC liquor license application.  Elixman responded that there was a "Master Escrow" that holds money deposited by investors and when Chicago Title would receive notice that there was a liquor license application that needed to be funded, Chicago Title would inform the ABC that it had money held in "Chicago Title trust accounts to fund the application until the deal closes."  The investor asked, "so no money ever leaves Chicago Title?"  According to the investor, Elixman responded "no money ever leaves the Chicago Title trust account. The money stays there.  We basically pledge it but we don't let it out, it stays here . . . we don't wire money to anybody."  The investor asked to see a list of then-pending liquor license escrows in the Lending Platform.  According to the investor, Elixman responded "'sure' and she went in the back, was gone a couple of minutes, and she came out with some paperwork – at least two or three pages – showing me liquor licenses that were currently in the works.  ***And with that I felt comfortable . . . [because] Chicago Title is a reputable company*.*"

45.    DuCharme and Elixman also assisted Champion-Cain in furtherance of the conspiracy by forwarding investor inquiries to defuse or deflect.  For example, in October 2016, an investor emailed DuCharme prior to investing $100,000 in the Lending Platform.  The investor's email asked, among other things, "[o]nce the funds are in the account are they listed in my name, ANI Development or Gina's" and [w]ho has access to the funds?"  Instead of responding, DuCharme forwarded the investor's email to Champion-Cain who, in turn, admonished the investor in a reply email responding to the investor's Chicago Title message: "I am the only contact for Escrow so they don't get hundreds of emails from this group; it would drive them nuts and it would never work."

46.    Similarly, as alleged in the SEC's complaint against Champion-Cain, in a July 18, 2017 email to DuCharme and Elixman, Champion-Cain apologized for an investor who had contacted them directly, stating "I told them NEVER to call and

bother you ladies." Champion-Cain concluded, "If they call asking about escrow agreements and alcohol licenses, blah, blah, blah . . . . just say 'SURE WHATEVER NOW SHOW ME THE MONEY . . . HAHAHAHA."

47.     Defendants Hanson, Torres and Bond also made false and misleading representations and omissions to Plaintiffs and other investors in furtherance of the conspiracy. Defendants Hanson, Torres and Bond created or transmitted false documents to Plaintiffs and other investors, including promissory notes, wire receipts, lists of supposed liquor license applications for lending opportunities, financial reports, and email correspondence.[1] As investors began to scrutinize the Lending Platform beginning in January 2019, Bond told one investor that "we've had to change some policies and I am no longer able to send out lists." Later, when new investor funds were drying up, Defendant Bond would inform noteholders that closings for their licenses – and, by extension, their payments of principal and interest – were being "delayed" due to backlog at the ABC. For example, on August 5, 2019, Bond informed an investor via email that a supposed liquor license application closing had been "delayed." When questioned about the cause of the delay – the *third* consecutive delay for that license – Bond responded:

> It's the same reason it has been for the last few years. We're still seeing a 60 to 90, sometimes up to 120, day delay mainly due to major under-staffing with the ABC but also because there have been a whole slew of new license types issued in the past few years, think craft brewery and spirits and the tasting rooms opening up all over, and compound

---

[1] Similar false and misleading statements and omissions made by Defendants Champion-Cain, Torres and Hanson in furtherance of the fraudulent scheme are alleged in plaintiffs' complaint ("Watermiser Complaint") filed on October 1, 2019, in the action titled *Watermiser Mfg. Co., et al. v. Gina Champion-Cain, et al.*, Case No. 37-2019-00052134-CU-BC-CTL, pending in Superior Court for the State of California, County of San Diego, Central Division. *See, e.g.*, Watermiser Complaint, ¶¶ 89-90, 92, 147.

that with the legalizing of cannabis which requires it's [sic] own types of licensing.  It's a mad house over there.

48.     Defendant Hanson similarly falsely told investors that license closings were "delayed," in order to forestall repayment obligations or demands.   For example, Hanson told an investor in February 2017, "[i]t looks like this one has been delayed to the end of March.  Things have been lagging at the ABC by a month or two because of the holidays and the crazy election year."

49.     When licenses supposedly did close, Defendant Champion-Cain discouraged investors from withdrawing funds and urged them to roll their principal and interest into funding new licenses in order to further perpetuate the fraud.  For example, Champion-Cain told an investor via email in January 2017 that she was "partnering up" with the attorney who finds the borrower-applicants on a "new enormous list" of licenses and trying to "fill out the last one with rollovers."  She claimed the lawyer was going to have "his biggest year yet" with the Lending Platform and wanted to continue for "2-4 more years . . . so I say let's make the mooolaaahhh while we can!☺"

50.     Champion-Cain would also report that other investors were rolling ***both*** their principal and interest into new license loans, claiming investors could defer taxes on any gains: "when that occurs, it is not considered a taxable event so there will not be a 1099 issued for that year."

51.     Champion-Cain's first investor ("First Investor") was a high net-worth real-estate investor with whom Cain had previously done business.  To ensure that his investment was secure, First Investor drafted a form escrow agreement to be executed by ANI and Chicago Title. That form escrow agreement provided that: (i) First Investor's money could only be used to fund a specified underlying liquor license transfer(s); (ii) First Investor's money would be held in an escrow account for this purpose at Chicago Title; and (iii) at the conclusion of the license transfer, First Investor's money would then be transferred back to him with interest.

According to the form agreement, First Investor's escrowed funds could be used for no other purpose and transferred under no other circumstances ("Form Escrow").

52.    Champion-Cain falsely represented to First Investor that his agreement would be the operative Form Escrow agreement governing his investments.

53.    For each license funded going forward, Champion-Cain and ANI also claimed to other investors that their investments would be subject to the same form of escrow agreement.

54.    However, Champion-Cain and ANI maintained complete control over the Lending Platform, instructing investors never to contact Chicago Title to inquire about their investments.

55.    For example, a representative escrow agreement stated that ANI and Chicago Title "understand that this is a limited escrow only and is being opened for the benefit of" a specified liquor license applicant, "who is applying for approval of a transfer to Applicant of a license issued by the California Department of Alcoholic Beverage Control." The escrow agreement then identified the license to be transferred by license number.

56.    With respect to the escrowed funds, ANI Development's Form Escrow agreement stated that they would be placed "into an interest-bearing account," and would only be released upon written instructions by ANI Development, and in that event, could only be transferred to a financial account maintained by ANI Development's investors.

57.    But in reality, with Chicago Title's knowing assistance, Champion-Cain and ANI Development had unfettered access to investor funds, and, at least in part, used that access to fund ANI's unrelated business operations.

58.    For example, in 2017, investors cumulatively deposited approximately $87.7 million into a pooled escrow account, yet no money was ever escrowed to

actually facilitate, as represented to investors, the transfer of the alcohol licenses identified in the false investor escrow agreements.

59.     At no point did Chicago Title ever notify California liquor licensing authorities that these funds had been placed in escrow for the transfer of a liquor license, as required under state regulations.

60.     Instead, Champion-Cain, who controlled ANI Development's and ANI's bank accounts, primarily used Lending Platform investor funds to pay back earlier investors the principal and interest they were owed, as well as to transfer approximately $22 million to ANI.

61.     A reasonable investor would have wanted to know, among other things, that the Lending Platform was wholly fictitious; that the real escrow agreements allowed Champion-Cain to withdraw investor funds at any time; that ANI does not appear to have made a single loan to alcohol-license applicants; that the Chicago Title accounts were not suitable for the transfer of alcohol licenses; that the Chicago Title escrow officers involved did not handle liquor license transfers or possess the "experience and knowledge" to act as an escrow agent for these types of transactions; and that the Chicago Title escrow officers responsible for safeguarding investor monies were beholden to Champion-Cain and accepting thousands of dollars in bribes and other valuable consideration to do her bidding.

62.     Champion-Cain and ANI Development's efforts in identifying liquor license escrow participants who were appropriate for investment, executing the loans to those entities, and collecting the purported interest payments from those participants, were critical to the enterprise's success, as investors were not allowed to play an active role in managing ANI Development's investment decisions under the Lending Platform.

63.     Section 24074 of the California Business & Professions Code requires an applicant for the transfer of an alcoholic beverage license to establish an escrow

account and deposit with the escrow holder the full amount of the purchase price or consideration while the application is pending.  Depending on location and type, a liquor license can cost more than $400,000 and the application can take more than one year to process.

64.    In 2012, Champion-Cain began to solicit and obtain financing supposedly for these transactions.  This financing was structured such that a third-party investor/lender would deposit funds directly into an account maintained by Chicago Title only after Champion-Cain provided the investor/lender with information regarding the applicant name and license number of the application. Champion-Cain also provided the investor/lender with a Form Escrow agreement signed by Champion-Cain and by a Chicago Title escrow officer. Champion-Cain represented to investors orally and in offering documents that, under the "Form Escrow," the funds being deposited by the lender could only then be used to fund a single, specific liquor license escrow. The investor/lender was a stated third-party beneficiary of the Form Escrow, which prohibited Chicago Title from releasing the escrowed loan amount to anyone other than the lender or using the funds for any other purpose.  When the application was granted, Chicago Title would return the principal to the lender, with the lender also to receive an agreed share of the interest, returning the balance of the interest to Champion-Cain.  This arrangement was designed to secure Lending Platform investors' funds and make certain they were never at risk.

65.    Extensive regulation of escrow companies exists under the California Escrow Law, Cal. Fin. Code § 17000, *et seq.*, and escrowed funds are insured through the Escrow Agents' Fidelity Corporation and additional state-law bonding requirements.  *See* Cal. Fin. Code § 17314.

**B.** __The True Nature Of The Lending Platform Scheme__

66. The ANI Lending Platform was a fraudulent scheme. Nothing was as represented to Plaintiffs.

67. There were no liquor license applicants applying for loans from ANI Development.

68. There were no individual escrow accounts established under the Form Escrow where the lenders/investors were third-party beneficiaries.

69. Many of the executed Form Escrow agreements provided to the lenders/investors are believed to be forgeries. According to an individual complaint filed in this District by other investors (the "Ovation Finance Complaint"),[2] Champion-Cain has reportedly admitted to federal law enforcement authorities, and will testify that Chicago Title knew that Champion-Cain was signing Form Escrows in the names of Chicago Title escrow agents. Plaintiffs' and other investors' funds were not deposited into accounts in the names of investors that were earmarked for individual liquor license applicants.

70. Instead, the "Master Account" at Chicago Title was governed by an entirely different contract (the "Concealed Non-Escrow") over which Champion-Cain had unfettered discretion to withdraw funds for any reason for a fee, payable to Chicago Title, of $500 per transaction. Indeed, the Concealed Non-Escrow was facially unlawful under the California Escrow Law, because it was not an "escrow" at all. A licensed escrow company like Chicago Title may not describe an account as an escrow, unless it meets the statutory definition of that term. Cal. Fin. Code § 17403.1.

71. Under the Escrow Law, an "escrow" is a "transaction in which one person, for the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person, delivers any written instrument, money,

---

[2] *See Ovation Finance Holdings 2 LLC, et al. v. Chicago Title Ins. Co., et al.*, No. 19-cv-2013-GPC-KSC (S.D. Cal.), ECF No. 1, filed Oct. 22, 2019.

evidence of title to real or personal property, or other thing of value to a third person to be held by that third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by that third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter."  Cal. Fin. Code § 17003(a).

72.     Although the Form Escrows satisfy that definition, the Concealed Non-Escrow does not.  The Concealed Non-Escrow was not made for "the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person"—it was essentially just a depository account.  Nor did it condition release on "the happening of a specified event or the performance of a prescribed condition"—Champion-Cain could, and did, withdraw funds at will for any reason. Nor did it entail delivery by Chicago Title to "a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter."  In reality, the funds were simply returned to Champion-Cain, the only beneficiary of the Concealed Non-Escrow contract, which notably makes no mention that third parties would be wiring hundreds of millions of dollars through the account.

73.     Despite the unlawfulness of the arrangement, Chicago Title facilitated the scheme by permitting Champion-Cain to take investors' funds out of accounts represented to Plaintiffs to be escrow accounts as if the accounts were simply Champion-Cain's checking account.

74.     Hundreds of millions of investors' dollars flowed through Champion-Cain's Concealed Non-Escrow account and Champion-Cain skimmed off tens of millions of dollars to fund various real estate, restaurant, and hospitality ventures by ANI, Champion-Cain's investment company and ANI Development's parent.

75.     When federal law enforcement authorities seized the scheme and placed ANI into receivership on August 28, 2019, only $11 million remained in the Chicago Title escrow account.  According to the most recent report by the Court-appointed

receiver, the remaining assets of Champion-Cain, ANI and ANI Development are valued at approximately $12-$14 million.

76.     Although the full magnitude of the fraud is currently unknown, based on available information, it has been estimated that Lending Platform fraud resulted in at least $400 million cycling through the Concealed Non-Escrow account, resulting in $140 million in lost principal by 50 or more investors.

## C.     Chicago Title Was Complicit In The Lending Platform Scheme

### 1.     Chicago Title Had Actual Knowledge Of, And Participated In, The Scheme Through Its Agents

77.     At least two Chicago Title escrow agents, Defendants DuCharme and Elixman, had actual knowledge of and participated in the Lending Platform scheme. While acting in their capacities as Chicago Title escrow agents, they were simultaneously working as part of the criminal Lending Platform conspiracy with Champion-Cain.

78.     Both knew all along that, although Champion-Cain was soliciting loans for liquor license escrow accounts under the Form Escrow, those loans were, in fact, being deposited into an account governed by the Concealed Non-Escrow, under which Champion-Cain had full discretionary control.  DuCharme and Elixman knew that Champion-Cain was engaged in a massive fraud and provided her substantial assistance.

79.     Chicago Title, by and through Elixman and DuCharme also knew that Champion-Cain was imitating them using "@chicagotitleescrows.com" email addresses. Despite knowing that Champion-Cain was using fake email accounts designed to look like they were emails sent from Elixman's and DuCharme's legitimate Chicago Title email accounts, neither Elixman nor DuCharme did anything to stop this deceitful conduct.  Indeed, they were willing participants who benefitted substantially from the scheme, by accepting payoffs and bonus

compensation for their efforts.  DuCharme and Elixman's misconduct was integral to their roles as escrow officers for Chicago Title—setting up escrows and ensuring that the parties who deposited money into them could have confidence that it was handled according to their instructions.  Their misconduct involved misuse of Chicago Title's core service and undermined the essential purpose of placing funds in escrow—to ensure the safety of the escrowed funds.

80.  Chicago Title, through DuCharme and Elixman, knew that Champion-Cain was creating forged Chicago Title escrow agreements to defraud Plaintiffs and other investors.  For example, in early 2017, investor Kim Funding, LLC ("Kim Funding") was attempting to secure additional funding from Torrey Pines Bank to invest in the Lending Platform.  In connection with a due diligence investigation, the bank called Chicago Title to confirm executed form escrow agreements between Kim Funding and ANI signed by a Chicago Title escrow officer identified as "Wendy Reynolds."  However, there was no "Wendy Reynolds" at Chicago Title. The signature had been forged by Champion-Cain.  When questioned by Kim Funding's principal, Kim Peterson, Champion-Cain claimed that Wendy Reynolds was a *former* Chicago Title employee and, to satisfy the bank, Champion-Cain could obtain substitute form escrows signed by a current Chicago Title escrow officer. According to the Ovation Finance Complaint, "[a]fter Champion-Cain's story was relayed to the bank, the bank told Peterson that it would consider loaning him money based on newly signed documentation, but it would need an officer of Chicago Title to sign an incumbency certificate certifying that the escrow officer had full authority to sign the Form Escrows on behalf of Chicago Title."

81.  On or around February 1, 2017, Champion-Cain went to Chicago Title's San Diego office to obtain fresh signatures on the form escrows.  There, DuCharme and Thomas M. Schwiebert, a Chicago Title Vice President, executed an Incumbency Certificate and Authorization of Chicago Title.  The Incumbency

Certificate certified that DuCharme was "authorized to execute Escrow Agreements for the purpose of requesting draws from [the bank] pursuant to" a credit agreement between Kim Funding and the bank, and that DuCharme was "duly elected, qualified, and acting as members, managers and(or) [sic] officers, as indicated, of [Chicago Title] and hold on the date hereof the offices or titles set forth opposite their respective names, and [that] the signatures set opposite each of their respective names are their genuine signatures[.]" Simultaneous with executing the Incumbency Certificate, and in the presence of Schweibert, DuCharme then re-signed twenty-four phony Form Escrow agreements in her own hand.

82.    Champion-Cain's cell phone records confirm a series of telephone calls between Champion-Cain and Kim Peterson, Schwiebert, and DuCharme (via DuCharme's mobile phone) between January 31, 2017, and February 24, 2017, consistent with the above-described activity and in furtherance of the scheme.

83.    The Ovation Finance Complaint alleges further communications with Chicago Title, DuCharme and Elixman evidencing their participation in and knowledge of the fraud. *See* Ovation Finance Complaint, ¶¶ 105-108.

84.    DuCharme and Elixman conducted their fraudulent activities out of Chicago Title's offices, using Chicago Title's bank accounts, telephones, computers, form escrow agreements and other documents, and, on some occasions, its email system.

85.    DuCharme and Elixman's deceitful actions were thus reasonably related to the kinds of tasks that a Chicago Title officer would be employed to perform. Their actions were also reasonably foreseeable in light of Chicago Title's business and DuCharme and Elixman's job responsibilities. That a Chicago Title escrow officer might participate in fraud using fraudulent escrow agreements and related documentation was a generally foreseeable risk inherent and incidental to Chicago Title's escrow business.

86.   Given the circumstances, breadth, and length of the fraud, there is substantial circumstantial evidence that higher management at Chicago Title would have been aware of the misconduct, had Chicago Title employed reasonable internal controls or followed its own internal policies for identifying and reporting suspicious activity.

87.   Through DuCharme and Elixman, Chicago Title knew that the Lending Platform investors believed that the money they funded through escrows held at Chicago Title would be used only for specific liquor license escrows under escrow agreements that did not permit Champion-Cain or ANI to unilaterally withdraw it.

88.   Through DuCharme and Elixman, and likely others, Chicago Title knew that Lending Platform investors' money was not, in fact, being used for those purposes.

89.   Chicago Title did not disclose those facts to Plaintiffs or other investors.

90.   Chicago Title is responsible for its authorized agents' misconduct in performing their core functions as Chicago Title escrow officers.

91.   Moreover, as a financial institution, Chicago Title is responsible to know if its employees are using the instrumentalities of its business to facilitate and engage in fraud.

92.   As a "licensed sender of money or any other person who engages as a business in the transmission of funds," Chicago Title is a "financial institution," subject to the Bank Secrecy Act. 31 U.S.C. § 5312(a)(2)(R).  The PATRIOT Act requires every financial institution covered by the Bank Secrecy Act to establish an anti-money laundering program.  31 U.S.C. § 5318(h).  In particular, under the PATRIOT Act, "each financial institution shall establish anti-money laundering programs, including, at a minimum—(A) the development of internal policies, procedures, and controls; (B) the designation of a compliance officer; (C) an ongoing employee training program; and (D) an independent audit function to test programs."

Treasury regulations enacted under the PATRIOT Act further require non-bank financial institutions to employ "know your customer" practices and to keep accurate records of financial transactions, including records regarding the verification of the identity of those transmitting funds.   31 C.F.R. §§ 1010.220, 1010.410(e). Moreover, California Escrow Law, Cal. Fin. Code § 17000, *et seq.*, further regulates the conduct of escrow agents and imposes detailed recordkeeping and auditing requirements of its own.  Cal. Fin. Code §§ 17404, 17406, 17406.1.

93.     As a financial institution and fiduciary responsible for safeguarding the funds of others, Chicago Title maintains internal controls to prevent fraud, such as auditing significant accounts, monitoring agent-client relationships, or periodically rotating agents to prevent them from becoming beholden to certain clients or conspiring in criminal enterprises such as this one.  Chicago Title's internal Code of Business Conduct & Ethics *requires* every employee to report any actual or suspected illegal or unethical conduct and provides a fraud and ethics hotline phone number at the bottom of each page.  The Code states that all employees are expected to be vigilant in discovering evidence of possible fraud or material misrepresentation, *including any misuse of or irregularity in handling and reporting escrow funds* by any agent of Chicago Title.  Indeed, according to one former San Diego-area Chicago Title escrow officer who worked for the company from November 2013 to 2014 and was interviewed in connection with Plaintiffs' counsel's investigation, Chicago Title employees were required to report suspicious activity *only to an internal Chicago Title security team*, which would decide whether to report the activity to law enforcement or government agencies.  "We were told to *never* contact authorities," the former employee said.  The former Chicago Title escrow officer also stated that, under Chicago Title's internal policies, it was "absolutely not allowed" and against Company policy for an escrow officer to accept gifts from a client.  "That is total[ly] against the law," he/she said, "you can't take

gifts" of any value or accept free food at restaurants owned by a client, as DuCharme and Elixman did.

94.    Acts by Defendants Chicago Title, DuCharme and Elixman in furtherance of the conspiracy also violated California statutory law.   California Financial Code § 17414(a) makes it illegal to: (1) "knowingly or recklessly direct, participate in, or aid or abet in a material way, any activity which constitutes theft or fraud in connection with any escrow transaction"; or (2) "[k]nowingly or recklessly make or cause to be made any misstatement or omission to state a material fact, orally or in writing, in escrow books, accounts, files, reports, exhibits, statements, or any other document pertaining to an escrow or escrow affairs." Any director, officer, stockholder, trustee, employee, or agent of an escrow agent who abstracts or willfully misappropriates money, funds, trust obligations or property deposited with an escrow agent is guilty of a felony.

95.    Despite all of this regulatory scrutiny—scrutiny whose purpose is to give confidence to the public—Chicago Title facilitated the scheme by permitting it to go on for years, using internal systems that should have been subject to review and audit by Chicago Title employees and consultants.  The ongoing fraud created a permanent record of escrow agreements, wire transfers, and electronic communications that could have been easily detected and stopped if Chicago Title followed the basic anti-money-laundering and "know your customer" procedures or internal control measures that any reasonable financial institution would follow.

**2.    Chicago Title, DuCharme, And Elixman Profited From The Lending Platform Fraud**

96.    Chicago Title profited from the scheme.  Over the life of the Lending Platform, hundreds of millions of dollars were wired into and out of Champion-Cain's Concealed Non-Escrow account.  Chicago Title was paid either $1,000 per non-existent Form Escrow (as represented by ANI) or $500 per withdrawal by

Champion-Cain (under the terms of the Concealed Non-Escrow). There were thousands of such transactions and Chicago Title received more than $1,000,000 in exchange for its participation in this criminal enterprise. Chicago Title also benefitted from Champion-Cain's misappropriation of Plaintiffs' and other investors' money by selling her escrow, title insurance, and other services in connection with the unauthorized business ventures, earning ample fees and commissions at each step. In addition, Champion-Cain directed tens of millions of dollars of lender funds into other Chicago Title escrows for her investments, generating additional compensation and fees for Chicago Title. All of this activity increased profitability and likely led to compensation and bonus increases for the escrow officers and various Chicago Title executives.

97.     DuCharme and Elixman personally profited from the ANI criminal enterprise, too. During the early years of the scheme, Champion-Cain paid DuCharme and Elixman thousands of dollars in cash bribes each year. Later, DuCharme also asked Champion-Cain to pay for a vacation to San Jose del Cabo, Mexico. Champion-Cain complied, and in February 2019, Champion-Cain used 280,000 United Airlines miles from her account to purchase first-class tickets for DuCharme and her husband. Champion-Cain paid any taxes or insurance costs for the DuCharmes' travel via her corporate credit card. DuCharme also demanded that Champion-Cain similarly subsidize an overseas trip for DuCharme's son, which Champion-Cain subsidized using approximately 172,500 airline miles.

98.     Champion-Cain also wined and dined DuCharme and Elixman at restaurants owned by Champion-Cain, providing them, along with their family and friends, with free food and drink. For example, a former ANI Vice President of Development employed from September 2012 to January 2019, and who reported to Champion-Cain, explained that Champion-Cain insisted that ANI only use Della DuCharme at Chicago Title for all escrows. "She absolutely would not allow a

project to move forward unless it was Della DuCharme" assigned to the escrow. "If Della didn't handle the escrow and title, it was a deal killer. Every single deal that we did [was with DuCharme]. There wasn't a single deal that we did that wasn't." He explained that Champion-Cain was very protective of DuCharme and never waivered from using her to do escrow and title work.

99.    Another former ANI Vice President of Development who worked with and reported to Champion-Cain from October 2010 to September 2019 confirmed that he/she regularly saw DuCharme at social events hosted by Champion-Cain, including Padres baseball games, concerts and holiday festivities. Champion-Cain would give Padres tickets to DuCharme—enough tickets so the escrow officer could bring her family and friends.

## V.    **CLASS ACTION ALLEGATIONS**

100.    Plaintiffs bring this suit as a class action on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons who invested in the ANI Lending Platform (the "Class"). Excluded from the Class are Defendants and their parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, immediate family members, and any entity in which each of these has a controlling interest or which has a controlling interest in any of them.

101.    **Numerosity**. Plaintiffs are informed and believe and upon that basis allege that the Class is comprised of at least sixty-five members. The Class members are too numerous to be practicably joined. The Class members are identifiable from information and records in the possession, custody, or control of Chicago Title. Notice of this action can be provided to all members of the Class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

102.   **Typicality**.   Plaintiffs' claims are typical of the claims of other members of the Class.   Plaintiffs and each Class member invested in the ANI Lending Platform and were subject to the wrongful conduct alleged in this complaint.

103.   **Adequacy of Representation**. Plaintiffs are members of the Class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests contrary to or in conflict with the interests of the other Class members.

104.   Plaintiffs' counsel are competent and experienced in class action and investor fraud litigation and will pursue this action vigorously.

105.   **Commonality and Predominance**. Common questions of fact and law exist as to all members of the Class and predominate over any questions pertaining to individual Class members.  Among the questions common to the Class are:

a.   Whether Defendants committed fraud, engaged in a racketeering enterprise and/or breached duties to Plaintiffs and members of the Class;

b.   Whether Chicago Title aided and abetted, joined, and/or participated in the fraudulent scheme, racketeering and/or breach of duties;

c.   Whether Chicago Title knowingly carried out transactions in furtherance of the fraudulent scheme with knowledge and reckless disregard that other Defendants were engaged in a racketeering enterprise, committing investor fraud, breaching fiduciary duties, and/or misappropriating investor funds;

d.   Whether Chicago Title's continued support for the fraudulent scheme, to the detriment of Plaintiffs and members of the Class, constitutes negligence;

e.   Whether Chicago Title's conduct alleged herein violates California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and

f.   Whether, in view of the harms suffered, Plaintiffs and Class members are entitled to damages, restitution and other remedies.

106.   **Superiority**. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although each Class member has suffered harm in connection with the ANI Lending Platform scheme, the cost of litigation will be high.  The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions. Absent a class action, most members of the Class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy. Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication.  Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. § 1962(c) Against All Defendants**

107.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

108.   This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

109.   At all relevant times, Chicago Title was a "person" within the meaning of 18 U.S.C. § 1961(3), as it was "capable of holding a legal or beneficial interest in property."

110.   As a limited liability company created for the sole purpose of operating the Lending Platform scheme, ANI Development operated as an "enterprise" through Defendants Champion-Cain, Torres, Hanson and Bond.

111.   Chicago Title—through its agents DuCharme, Elixman, and others yet unknown—conducted and participated in the affairs of the ANI Lending Platform scheme through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), consisting of numerous and repeated instances of wire fraud, bank fraud, money laundering, and bribery in violation of 18 U.S.C. § 1962(c).

112.   Chicago Title benefitted from the acts of DuCharme, Elixman, and its other unnamed agents.  It was paid $1,000 for each fictional "escrow" that DuCharme and Elixman accepted funds for and falsely purported to set up and/or $500 for each withdrawal or disbursement to ANI, Champion-Cain, or affiliated entities.

113.   ANI Development was created and/or used as a tool to carry out the elements of the illegal scheme and pattern of racketeering activity. ANI Development had an ascertainable structure beyond the scope and commission of the predicate acts and conspiracy to commit such acts.  ANI Development is further a corporate entity separate and distinct from defendants.

114.   Champion-Cain and Chicago Title—through their agents and their co-conspirators—conducted the affairs of ANI Development and all had the common purpose to secure benefits and profit by obtaining access to capital and diverting it to their own uses through wire fraud, bank fraud, money laundering, and commercial bribery.

115.   ANI Development engaged in, and its activities affected, interstate and foreign commerce by, among other things, unlawfully borrowing money in interstate transactions and investing it in other businesses that engaged in interstate commerce.

116.   Chicago Title participated in the operation and managed the affairs of the enterprise as described herein.

117.   Chicago Title committed, or aided and abetted, the commission of multiple discrete predicate acts of racketeering activity. The multiple acts of racketeering activity that Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, extended for several years, had fifty or more victims, and, had the government not placed ANI Development into a receivership, posed a threat of further continuing criminal activity, and therefore constitute a "pattern of racketeering activity."

118.   Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

a.   **Racketeering Act 1:**  During, at minimum, 2015 and 2016, DuCharme and Elixman accepted cash gifts in excess of $250 from Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use their positions as Chicago Title escrow officers for the benefit of ANI Development's ongoing scheme, acts of bribery in violation of California Penal Code § 641.3.

b.   **Racketeering Act 2:**  From at least 2015 and continuing to August 28, 2019, DuCharme and Elixman accepted complimentary dining experiences and other entertainment valued in excess of $250 from Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use their positions as Chicago Title escrow officers for the benefit of Champion-Cain and the ANI scheme, acts of bribery in violation of California Penal Code § 641.3.

c.   **Racketeering Act 3:** Plaintiffs and the Class wired millions of dollars to an account controlled by Chicago Title, with the understanding that the funds would be placed in an escrow account to fund specific liquor license application

escrows arranged by ANI Development, and under escrow conditions mandating that the funds could not be distributed to any person other than Plaintiffs or other Class members.  Without disclosing it to Plaintiffs and the Class, Chicago Title caused their money to be deposited into the Concealed Non-Escrow account at Chicago Title over which Champion-Cain had full discretionary authority to withdraw funds at will for a fee of $500 per transaction, in violation of 18 U.S.C. §§ 2 and 1343.

     **d.**    **Racketeering Act 4:** On or about January 20, 2018, DuCharme accepted a $13,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI Development's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

     **e.**    **Racketeering Act 5:** On or about January 20, 2018, Elixman accepted a $5,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI Development's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

     **f.**    **Racketeering Act 6:** On or about December 16, 2018, DuCharme accepted a $10,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI Development's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

     **g.**    **Racketeering Act 7:** On or about December 16, 2018, Elixman accepted a $1,000 check from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing

to use her position as a Chicago Title escrow officer for the benefit of ANI Development's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

**h.   Racketeering Act 8:**  On or about February 21, 2019 and thereafter, DuCharme accepted airline travel and other valuable consideration from the personal account of Champion-Cain, corruptly and without the knowledge or consent of Chicago Title, in return for using or agreeing to use her position as a Chicago Title escrow officer for the benefit of ANI Development's ongoing scheme, an act of bribery in violation of California Penal Code § 641.3.

**i.   Racketeering Act 9:**  Beginning in 2015 and continuing through August 28, 2019, Chicago Title, DuCharme, Elixman and others acting in the interest of Chicago Title knew of and participated in ANI Development, Champion-Cain, and other Defendants' numerous acts of transferring over $10,000 of the proceeds of wire fraud from the Concealed Non-Escrow account at Chicago Title to accounts possessed and controlled by Champion-Cain and/or ANI Development's parent company, ANI, for use in funding the business activities of ANI, in violation of 18 U.S.C. §§ 2, 1956, and 1957.

119.   As discussed above, as a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

**SECOND CAUSE OF ACTION**
**RICO Conspiracy**
**Violation of 18 U.S.C. § 1962(d) Against All Defendants**

120.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

121.   This claim alleges a violation of 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

122.   Chicago Title conspired with Champion-Cain to violate 18 U.S.C. § 1962(a) and (c), as described herein.

123.   Champion-Cain, together with Torres, Hanson and Bond, participated as a co-conspirator with Chicago Title in the above listed offenses and performed those acts in furtherance of the conspiracy.

124.   Chicago Title—through its agents DuCharme and Elixman—and Champion-Cain agreed, whether expressly or tacitly, that some person would commit at least of two predicate acts set forth above in the course of participating in the affairs or operations of the ANI scheme, in violation of 18 U.S.C. § 1962(c).

125.   Chicago Title—through its agents DuCharme and Elixman—and Champion-Cain agreed, whether expressly or tacitly, that some person would commit at least of two predicate acts set forth above in the course of using the proceeds of the conduct alleged above to wrongfully transmit funds to ANI, in violation of 18 U.S.C. § 1962(a).

126.   Chicago Title—through its agents DuCharme and Elixman—was aware of the essential scope and nature of and intended to participate in the scheme to corruptly operate ANI Development to the benefit of Champion-Cain and to use the proceeds of the conduct alleged above to wrongfully transmit Plaintiffs' and other Class members' funds to ANI.

127.   There was no plausible lawful rationale for the manner in which Chicago Title and its co-conspirators participated in the affairs of ANI Development or wrongfully transfer Plaintiffs' and other Class members' funds to ANI.

128.   As discussed above, Plaintiffs have been injured in their business and property as a direct and proximate result of the unlawful agreement between Chicago Title and Champion-Cain.

### THIRD CAUSE OF ACTION
**Violation of California Business and Professions Code Section 17200, *et seq.*, Against Chicago Title, DuCharme and Elixman**

129.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

130.   California Business and Professions Code Sections 17200, *et seq.*, of the Unfair Competition Law, defines unfair business competition to include any "unlawful, unfair and fraudulent" business act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.

131.   Pursuant to California Business and Professions Code Sections 17200, *et seq.*, and the common law of unfair competition, the business practices of Defendant described above are, and have been, unlawful, unfair and fraudulent and have a tendency to mislead the general public.

132.   Specifically, Defendants created and disseminated false and misleading promotional materials, investment overviews, emails, promissory notes, financial statements, and other reports and communications that were designed to mislead Plaintiffs and other Class members to invest in the Lending Platform.  Additionally, Defendants' conduct was unfair and deceptive in that Defendants omitted to disclose material information known only to themselves that a reasonable investor and member of the public would want to know.

133.   As a result of Defendants' unlawful and unfair business practices, Plaintiffs and the proposed Class have suffered actual monetary damages in an amount that will be established during trial.

134.   Plaintiffs, on behalf of themselves and the proposed Class, seek all remedies and relief pursuant to the provisions of California Business and Professions Code Sections 17200, *et seq.*, including, *inter alia*, restitution and the disgorgement of money acquired by means of the unlawful and unfair business practices alleged above.

**FOURTH CAUSE OF ACTION**
**Aiding and Abetting Fraud**
**Against Chicago Title, DuCharme, Elixman, Hanson, Torres and Bond**

135.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

136.   Champion-Cain committed a fraud upon Plaintiffs and other Class members since at least 2012.

137.   Among other things, Champion-Cain made factual representations in contracts that were not true at the time they were made, for the clear purpose of enticing Plaintiffs to unwittingly invest money in the ANI Lending Platform.

138.   Chicago Title, DuCharme and Elixman had actual knowledge of the Lending Platform fraud.  Among other things, DuCharme and Elixman knew that Champion-Cain was forging Form Escrows, using false email addresses to impersonate them, and operating the ANI Development escrow accounts under the Concealed Non-Escrow in such a way that, while Plaintiffs and other Class members were depositing millions of dollars into accounts believed to be controlled under the Form Escrow, Champion-Cain was withdrawing money within her sole discretion.

139.   Further, DuCharme and Elixman's receipt of bribes from Champion-Cain to continue the fraud raises a strong inference that DuCharme and Elixman, and therefore Chicago Title, had actual knowledge of the fraudulent scheme.

140.   Chicago Title also actively participated and facilitated in the ANI Lending Platform fraud.  Among other things: (1) as described above, while acting

in the scope of their authority and employment, DuCharme and Elixman made various fraudulent statements to facilitate the scheme; (2) Chicago Title failed to disclose facts while under an obligation to do so, under circumstances that permitted the scheme to continue; (3) DuCharme and Elixman assisted Champion-Cain in signing numerous Form Escrows after a bank's diligence revealed them to be likely forgeries, thereby perpetuating the scheme; (4) Chicago Title, DuCharme, and Elixman all personally profited from the scheme; (5) DuCharme and Elixman, while acting in the scope of their authority and employment with Chicago Title, processed hundreds of wire transfers into and out of ANI Development's escrow accounts under the Concealed Non-Escrow, knowingly permitting Champion-Cain and ANI to steal Plaintiffs' principal and accrued interest.

141.    DuCharme and Elixman acted with oppression, fraud, or malice in aiding and abetting Champion-Cain's fraud.

142.    Chicago Title had actual knowledge of the unfitness of DuCharme and Elixman and acted with reckless disregard of the rights of Plaintiffs in continuing to employ DuCharme and Elixman for years while they participated in the ANI Lending Platform scheme.

143.    Defendants Hanson, Torres and Bond had actual knowledge of the ANI Lending Platform fraud and acted with oppression, fraud, or malice in aiding and abetting Champion-Cain's fraud.  Defendants Hanson, Torres, and Bond assisted Champion-Cain in creating and disseminating false and misleading investor promotional materials, promissory notes, liquor license application lists, emails, reports and other communications that were designed to and, in fact, did perpetuate the ANI Lending Platform fraud.

144.    As discussed above, Plaintiffs were injured by Defendants' aiding and abetting of the Lending Platform fraud.

## FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### Against Chicago Title, DuCharme and Elixman

145.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

146.   Acting through agents upon whom Chicago Title endowed with ostensible authority in their interactions with Plaintiffs and other Class members, Chicago Title became party to Form Escrows for the benefit of Plaintiffs.

147.   Under the Form Escrows, Chicago Title received millions of dollars in investor funds from Plaintiffs and other Class members through wire transmissions and other means.

148.   Under the Form Escrows, Chicago Title agreed, among other things, not to release the escrowed funds to any persons other than Plaintiffs and other investors.

149.   Chicago Title served as the Escrow Holder for these escrow accounts.

150.   As the Escrow Holder, Chicago Title owed a fiduciary duty to Plaintiffs and other Class members, including, but not limited to, duties to: (1) refrain from acting against Plaintiffs' interests in administering funds Plaintiffs deposited into accounts Plaintiffs believed to be controlled by the Form Escrows; (2) disclosing any materially adverse information, such as the existence of the Concealed Non-Escrow; and (3) exercising reasonable skill and diligence in carrying out the Form Escrow agreements.

151.   Chicago Title, through its agents acting within the scope of their employment, breached its fiduciary duty to Plaintiffs and other Class members by knowingly wiring Plaintiffs' deposited funds into the Concealed Non-Escrow, from which Champion-Cain was regularly withdrawing funds contrary to the terms of the Form Escrows.

152.   Chicago Title had actual knowledge, through its agents DuCharme and Elixman, that the Form Escrows were either forged or ineffective, since it was treating the Concealed Non-Escrow as the effective agreement governing those accounts.

153.   Despite owing Plaintiffs and other Class members fiduciary duties, Chicago Title failed to disclose material information regarding the terms of the escrow accounts Plaintiffs were wiring money into.

154.   As discussed above, Plaintiffs and the Class have been harmed as a result of Chicago Title's breaches of its fiduciary duties.

## SIXTH CAUSE OF ACTION
### Negligence
### Against Chicago Title, DuCharme and Elixman

155.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

156.   Chicago Title owed Plaintiffs and the Class a duty of care, because, among other things: (1) the contracts under the Form Escrow were specifically intended to protect Plaintiffs; (2) given Chicago Title's knowledge of the Form Escrows, it was foreseeable to Chicago Title that Plaintiffs would suffer harm if their funds were not adequately protected; (3) Plaintiffs' lost principal is a concrete and certain injury; (4) Chicago Title's conduct was integral to the injuries suffered by Plaintiffs; (5) Chicago Title's conduct was morally reprehensible; (6) imposing a duty of care on Chicago Title and those similarly situated will prevent harm to future beneficiaries of escrow arrangements; and (7) extraordinary circumstances existed because Chicago Title released Plaintiffs' funds to Champion-Cain and ANI, in violation of the Form Escrows, thus permitting Champion-Cain and ANI to steal Plaintiffs' funds.

157.   Chicago Title's duty of care included, among other things, a duty to monitor its business to ensure that its employees were not using the instrumentalities of the company to carry out and aid and abet fraudulent schemes to deprive Plaintiffs of funds, which Plaintiffs had been led to believe would be deposited into safe escrow accounts at Chicago Title.

158.   Chicago Title breached its duty of care by, among other things, failing to detect or prevent DuCharme and Elixman from using its instrumentalities to carry out the ANI Lending Platform scheme.

159.   As discussed above, Plaintiffs and other Class members have been harmed as a result of Chicago Title's failures to abide by its duty of care.

## VII.   PRAYER FOR RELIEF

Plaintiffs pray for the following remedies:

A.   Certifying this action as a class action and certifying Plaintiffs as class representatives and Plaintiffs' counsel as class counsel.

B.   Awarding monetary damages according to proof, including compensatory damages, lost interest, lost profits, incidental and consequential damages and treble damages for the RICO violations.

C.   Awarding punitive damages.

D.   Awarding pre-judgment interest.

E.   Awarding attorneys' fees and costs of suit to the extent permitted by law.

F.   Awarding such other relief as the Court determines just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any counts for which a trial by jury is permitted by law.

1  Date: November 5, 2019                    Respectfully submitted,

2

3                                           By: */s/ Benjamin Galdston*

4                                           Benjamin Galdston
                                            BERGER MONTAGUE PC
5                                           12544 High Bluff Drive, Suite 340
                                            San Diego, CA 92130
6                                           Tel: (619) 489-0300
7                                           Email: bgaldston@bm.net

8                                           Michael Dell'Angelo
                                            Barbara A. Podell
9                                           BERGER MONTAGUE PC
10                                          1818 Market Street, Suite 3600
                                            Tel: (215) 875-3000
11                                          Email: mdellangelo@bm.net
12                                                 bpodell@bm.net

13                                          *Counsel for Plaintiffs and*
14                                          *the Proposed Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28