UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLAKE E. ALLRED, et al.<br><br>                              Plaintiffs,<br><br>v.<br><br>CHICAGO TITLE COMPANY, et al.<br><br>                              Defendants. | Case No.:   19cv2129-LAB (AHG)<br><br>**ORDER DISMISSING CLAIMS AGAINST DEFENDANT CRIS TORRES;**<br><br>**ORDER GRANTING IN PART MOTIONS TO DISMISS; AND**<br><br>**ORDER GRANTING IN PART MOTION TO STAY**<br><br>**[DOCKET NUMBERS 34, 35, 37, 73.]** |

Defendant Chicago Title filed a motion to dismiss, or in the alternative to stay this action, as did Defendant Betty Elixman. (Docket nos. 34 and 37.)   Defendant Adelle DuCharme filed a motion to stay. (Docket no. 35.)  These motions are fully briefed and ready for adjudication.  Plaintiffs also filed a motion, styled as a joint motion, to dismiss claims against Defendant Cris Torres. (Docket no. 73.) The Court set a briefing schedule for the latter motion, and Chicago Title has opposed it. That motion is also fully briefed and ready for adjudication.

19cv2129

**Dismissal of Claims Against Defendant Torres**

A plaintiff may dismiss some or all defendants under Fed. R. Civ. P. 41(a). *Wilson v. City of San Jose*, 111 F.3d 688, 692 (9th Cir. 1997). If the defendant to be dismissed has neither answered nor filed a motion for summary judgment, the plaintiff may dismiss unilaterally under Rule 41(a)(1)(A)(i). Though Defendant Torres has appeared, he has not filed either an answer or a motion for summary judgment. Under this Circuit's controlling precedent, a plaintiff may unilaterally dismiss such a defendant. *See Pedrina v. Chun*, 987 F.2d 608, 609 (9th Cir. 1993). When this happens, dismissal is effective immediately upon filing. *See Atain Specialty Ins. Co. v. Marquez*, 2020 WL 4676478, slip op. at *2 (E.D. Cal., Aug. 12, 2020) (citing *Concha v. London*, 62 F.3d 1493, 1506 (9th Cir. 1995)).

This is a putative class action, but no class has been certified, nor is certification being proposed for purposes of settlement. *See* Fed. R. Civ. P. 23(e). Although the motion seeks dismissal of all claims with prejudice, the Court construes this as a request to dismiss Plaintiffs' own claims with prejudice, and putative class claims without prejudice. So construed, the motion to dismiss claims against Torres is **GRANTED**. Chicago Title has expressed concern that dismissal will prevent it from learning why Plaintiffs decided to dismiss claims against Torres. Nothing in this order forbids it from seeking discovery as authorized under any other provision of law.

**DuCharme's Motion to Stay**

DuCharme seeks stay of this case for 90 days, because she was the target of the government's criminal investigation. But events after she filed her motion have likely mooted her request. First, developments in this and related cases slowed adjudication of the motions, which bought her some respite. Second, Defendants Cris Torres and Gina Champion-Cain have pled guilty in cases 20cr2114 and 20cr2115, respectively. This has likely brought clarity to some areas

/ / /

of concern to DuCharme. Elixman raised similar concerns in her motion, although she made other arguments as well.

As discussed below, the Court grants a temporary stay, albeit for other reasons.

**Motion to Dismiss or Stay**

Both Elixman and Chicago Title argue that the action should be dismissed, or in the alternative stayed, for failure to join a necessary party. Elixman argues that Kim Peterson, Kim Funding, and ANI Development, LLC are necessary parties. Chicago Title argues that ANI Development, LLC and American National Investments, Inc. (collectively, "ANI") are necessary parties. Both also seek dismissal for failure to state a claim.

### Failure to Join a Necessary Party

Under Fed. R. Civ. P. 19(a)(1), a party must be joined when either of two conditions is met. Under Rule 19(a)(1)(A), a person is a necessary party if, "in that person's absence, the court cannot accord complete relief among existing parties . . . ." Under Rule 19(a)(1)(B), a person is a necessary party if he claims an interest relating to the action and if adjudicating the action in that person's absence may lead to either of two scenarios: either adjudication may as a practical matter impair the absent person's ability to protect his interest, or the person's absence may result in an existing party's incurring multiple or inconsistent obligations. If a necessary party has not been joined as required, the Court must order that that person be made a party.  Rule 19(a)(2). But if joinder is not feasible, the Court must determine whether the action should proceed among the existing parties or be dismissed.  *See Washington v. Daley*, 173 F.3d 1158, 1169 (9th Cir. 1999); Rule 19(b).

Motions to dismiss for failure to join a necessary party are bought under Fed. R. Civ. P. 12(b)(7).  The moving party bears the burden of persuasion. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990). The movant must first

show that the party is necessary. If so, the Court must determine whether the absent person is indispensable, such that in "equity and good conscience" the suit should be dismissed. *Id.* "The inquiry is a practical one and fact specific . . . ." *Id.* In ruling on the motion, the Court accepts as true the allegations in the complaint, drawing all reasonable inferences in Plaintiffs' favor. *See Paiute-Shoshone Indians of Bishop Community of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 996 n.1 (9th Cir. 2011).

Developments in the related SEC action, 19cv1628, *SEC v. Champion-Cain*, have affected the Court's analysis of this issue. In its motion, Chicago Title suggests that the receiver in the SEC action might pursue claims against Chicago Title. After the motions were filed, the receiver in the SEC action sought Court approval to bring claims against Chicago Title. The Court held a hearing but has not yet authorized the receiver to bring that action. The proposed action may involve the receiver asserting claims on behalf of ANI. If that were to happen, and if both actions were to go forward at once, Chicago Title would be at risk of conflicting judgments.

Elixman also argues that Kim Peterson and Kim Funding are necessary parties but cannot be joined because both are in bankruptcy.  It is less clear why they are necessary parties. Elixman argues that she cannot effectively investigate them, and also argues that both would be bound by a judgment in this case even if they did not participate. While both allegedly played a role in the wrongdoing, it is not clear how significant that role was. The complaint suggests that Kim Peterson, an investor, was duped by Champion-Cain. (*See* Compl., ¶ 80.) Kim Peterson and Kim Funding are mentioned in only three paragraphs of the complaint. Based on those allegations it appears their involvement was not great. Elixman cites the complaint in the related case, 19cv2031, *Ovation Finance Holdings 2 LLC v. Chicago Title* as showing that Kim Funding's involvement was greater than the complaint in this case alleges. Most of the allegations in the

*Ovation* complaint, however, describe Kim Funding's financial and other business arrangements with Ovation and Banc of California in facilitating their investment in the lending platform, rather than their involvement with the scheme more generally. The complaint does not treat either Kim Peterson or Kim Funding as deeply involved either in the scheme or in arrangements with other investors.

As to Kim Peterson and Kim Funding, the Court finds Elixman has not met her burden of showing they are necessary parties. It appears, however, that ANI will be a necessary party if the receiver's motion for authorization to proceed against Chicago Title is granted. As discussed at the hearing on the receiver's motion, the Court was considering staying actions against Chicago Title, in order to facilitate an orderly disposition of the receiver's actions. Bearing in mind that this case is still in the pleading stage, and that the Court has yet to rule on the receiver's motion, the Court finds it unnecessary to stay the case at this time. But after Plaintiffs file an amended complaint — assuming they do — the case will be stayed at least until the Court rules on the receiver's motion. After that, the Court may revisit the request for a long-term stay.

**Failure to State a Claim**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[S]ome threshold of plausibility must be crossed at the outset" before a case is permitted to proceed. *Id.* at 558 (citation omitted). The well-pleaded facts must do more than permit the Court to infer "the mere possibility of misconduct"; they must show that the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

When determining whether a complaint states a claim, the Court accepts all allegations of material fact in the complaint as true and construes them in the light most favorable to the non-moving party. *Cedars-Sinai Medical Center v. National*

*League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007) (citation omitted). The Court does not weigh evidence or make credibility determinations. *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013). The Court, however, is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint," and does "not . . . necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citations and quotation marks omitted).

To meet the ordinary pleading standard and avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. But claims that sound in fraud, including those arising under state law, must be pled with particularity. Fed. R. Civ. P. 9(b); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003). This includes alleging who made various misrepresentations, how the misrepresentations were conveyed to the plaintiff, and under what circumstances. *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1998). It also requires a plaintiff to explain why statements were misleading or false. *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).

New allegations in opposition to a Rule 12(b)(6) motion to dismiss may be considered when deciding whether to grant leave to amend, but are not considered when ruling on the motion itself. *See Schneider v. Cal. Dep't of Corr. & Rehab.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

### RICO Claims

Plaintiffs bring two Racketeer Influenced and Corrupt Organizations Act (RICO) claims under 18 U.S.C. § 1962(c) and (d), respectively. In 1995, Congress enacted the Private Securities Litigation Reform Act (PSLRA), which amended the RICO statute to provide that securities fraud cannot serve as a predicate act for a RICO claim.  *See* 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct

that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.") Congress' focus was on eliminating treble damages for securities fraud claims, which it reasoned existing securities laws already provided an adequate remedy for. *See Bald Eagle Area Sch. Dist. v. Keystone Fin'l Inc.*, 189 F.3d 321, 327 (3d Cir. 1999); *MJK Partners, LLC v. Husman*, 877 F. Supp. 2d 596, 603 (N.D. Ill. 2012). The PSLRA bar proscribes the use as a RICO predicate of any conduct that would have been actionable as securities fraud, even if pled as some other claim, such as wire fraud or mail fraud. *See Swartz v. KPMG, LLC*, 401 F. Supp. 2d 1146, 1151 (W.D. Wash. 2004), *aff'd in relevant part*, 476 F.3d 756, 761 (9th Cir. 2007). *See also Bald Eagle*, 189 F3.d 327. A plaintiff cannot avoid the PSLRA bar by relying on only some parts of an overall scheme as RICO predicate acts, and avoiding those parts connected with the sale or purchase of securities. *See id.*, 189 F.3d at 330.

The parties agree that if securities or securities transactions are at issue, the PSLRA bars the claim. Their principal dispute here focuses on whether the lending platform alleged in the Complaint was an investment for purposes of the PSLRA securities fraud bar. Plaintiffs take the position that their investments amounted to private short-term commercial loans.

In general, when determining what amounts to a security for purposes of federal securities laws, "form should be disregarded for substance and the emphasis should be on [the] economic reality . . . ." *United Housing Found. v. Forman*, 421 U.S. 837, 849 (1975). The Supreme Court has made clear, however, that federal securities laws are intended to be read liberally, recognizing the "virtually limitless scope of human ingenuity" devised by those who seek the investment of third parties. *SEC v. Rubera*, 350 F.3d 1084, 1089 (9th Cir. 2003) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990)). The definition of "security" is not restrictive, but "encompass[es] virtually any instrument that might be sold as an investment." *Id.* at 1090 (citing *Reves*, 494 U.S. at 61). Securities

include, among other things, investment contracts, which are defined as any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *Id.* (*quoting SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946)).

The complaint alleges that from 2012 to 2019, Defendants defrauded Plaintiffs and other investors by means of a lending program or platform, which they refer to as the Lending Platform. (Compl., ¶ 1.) Supposedly, Plaintiffs' investment funds would be deposited in escrow accounts with Chicago Title, and lent out to borrowers to purchase liquor licenses. (*Id.*, ¶¶ 1, 2.) *See* Cal. Bus. & Prof. Code § 24074 (escrow provisions). Borrowers would pay fees for the short-term use of the funds, bringing in returns of 18% or higher. (*Id.*, ¶ 4.) Investors could elect to cash out or reinvest their money. (*Id.*) If a borrower's license application was denied, investors would earn nothing, though they were also told they would lose nothing. (*Id.*) The investment was touted as risk-free, because the money would never leave Chicago Title escrow accounts. (*Id.*, ¶¶ 4, 5.) In fact, the complaint alleges, none of this actually happened. Instead, Gina Champion-Cain funneled the money off for her own personal use. This was done, Plaintiffs allege, through ANI and with the assistance of the other Defendants. (*Id.*, ¶ 7.)

The Lending Platform forms the overarching structure of the investment. According to the Complaint, liquor license applicants in California must place in escrow an amount equal to the license purchase price while their application is pending. (*Id.*, ¶ 38.) Licensee-applicants were supposedly vetted (*Id.*, ¶ 42) and for those deemed eligible for loans, individual escrow accounts were supposed to be created, to be funded from investors' pooled funds. Although investor funds were supposed to be held in a single account, investors could choose which license applications they wished to fund. (*Id.* ¶ 43.) If a license application was eventually approved, the licensee-applicant would replace the escrowed Lending Platform funds with his or her own funds, and would pay a fee. The Complaint

includes a chart that investors were provided showing how the Lending Platform was supposed to work. (*Id.*, ¶ 41.)   It also quotes from a 2017 private placement offering memorandum for the California Opportunity License Fund, LLC. (*Id.*, ¶ 42.) According to the memorandum, the LLC itself was the lender and described the process as protecting the LLC's investment.

The Complaint's allegations describe the Lending Platform (as it was supposed to have functioned)[1] as a common enterprise. Investors handed their money over to Defendants, who would do all the work, including finding and vetting licensee-applicants, conducting other necessary transactions and business, and eventually either returning investors' money to them or reinvesting it, whichever they chose. The only part of the process investors were involved in was selecting particular licensee-applicants' accounts to fund, from a list compiled by Defendants. Other than that, their role was passive.

Although the investment was promoted as risk-free, the rate of return was variable and would depend on how good a job the Lending Platform's agents did. If they failed to find, reach agreements with, or vet enough licensee-applicants, investors would earn little or nothing. If they improperly vetted licensee-applicants such that many applicants were eventually denied licenses, investors would earn less or might end up depositing their money indefinitely and never earning a return.

Even if the Lending Platform had functioned as Defendants represented it would, it would be more accurate to describe it as low-risk rather than truly risk-free. Promotional materials hedged on this point, saying "we believe that any risks

---

[1] That the Lending Platform was nonexistent does not change the analysis. Whether fraud amounts to securities fraud depends on what a defendant purports to be promoting or selling when it induces its victims to invest. *See SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) ("[I]t is the representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract (or other security).")

associated with these activities are exclusively borne by Chicago Title . . . ." (Compl., ¶ 2.) Putting property into escrow is one way to assure a seller that a buyer has the means to pay, as well as a way for the buyer to control the timing of the transfer. *See Grover Escrow Corp. v. Gole*, 71 Cal. Rptr. 646, 650 (Cal. App. 4 Dist. 1968) (describing the purpose of an escrow account under Cal. Bus. & Prof. Code § 24074). In this sense, the escrowed funds serve as a kind of surety against the happening of some event (*e.g.,* the buyer being obligated to go through with the purchase, but not having enough money). But if that event — however unlikely it might seem — happens, the escrowed property would be at risk. If it were otherwise, there would be no point in putting funds into escrow. For example, if a borrower's license application was approved, the borrower was *supposed* to replace group funds with the borrower's own funds. (Compl., ¶ 39.) If the borrower was unable or unwilling to do so, the escrowed funds would potentially be at risk.

In other words, the amount of return (or possible loss) depended on Defendants' managerial skill and efforts. If Defendants did a poor job such that the Lending Platform had turned no profit, or even if it had lost money, Plaintiffs would have had no real recourse. By investing their money in the Lending Platform, Plaintiffs were placing substantial trust in Defendants to do the necessary work to minimize any risk and to turn as large a profit as possible. In *United States v. Carman*, 577 F.2d 556 (9th Cir. 1978), the defendant argued that investors in notes to be paid at a fixed rate of interest had not purchased a security. The Ninth Circuit rejected the argument, reasoning that investors were "in a totally passive role with respect to collecting on the notes," and also faced some potential risk, which they relied on the defendant's "sound management and continued solvency" to eliminate. *Id.* at 563. That Chicago Title emphasized its agents' skill and experience, and its own reputation as a secure institution and experienced fiduciary (Compl., ¶¶ 1, 2, 5, 8), while not decisive by itself, nevertheless underscores this point. The Complaint also emphasizes the crucial role Champion-

Cain and ANI would have played in the such an enterprise, and investors' passive role:

> Champion-Cain and ANI Development's efforts in identifying liquor license escrow participants who were appropriate for investment, executing the loans to those entities, and collecting the purported interest payments from those participants, were critical to the enterprise's success, as investors were not allowed to play an active role in managing ANI Development's investment decisions under the Lending Platform.

(Compl., ¶ 62.)

It is also significant that many investors were invited to take part in the Lending Platform, which required no particular sophistication or any effort on their part; their role, essentially, was to front the money, for which they would reap a variable return. *See Farris*, 614 F.2d at 641 (distinguishing the case from *Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc.*, 583 F.2d 426 (9th Cir. 1978) in part on the fact that in *Amfac* the promissory note was offered to one sophisticated investor only). This brings the Lending Platform within the definition of a security. *See Farris*, 614 F.2d at 641 (citing definitions of securities). Because Plaintiffs' two RICO claims are premised on transactions that are actionable as securities fraud, the PSLRA bars them.

Although Plaintiffs are not necessarily estopped by the Court's decisions in related cases, it bears mention that case 19cv1628 represents the SEC's efforts to bring securities fraud claims against Gina Champion-Cain and others in connection with these same transactions. Torres has pled guilty in case 20cr2114 to conspiracy to commit securities fraud, and Champion-Cain has pled guilty in case 20cr2115 to (among other things) securities fraud and conspiracy to commit securities fraud. To treat the Lending Platform investments as something other than securities would be anomalous.

**Failure to Plead Fraud with Particularity**

1   Plaintiffs' third and fourth cause of action sound in fraud, and therefore must
2   be pled with particularity. *See Rubke* 551 F.3d at 1161. Although the third cause
3   of action is brought under California's Unfair Competition Law, its only allegedly
4   unlawful or unfair acts amount to fraud. (Compl., ¶ 132.)

5   Chicago Title points out that the Complaint treats both Chicago Title entities
6   as a single unit, without either differentiating between them or alleging facts to
7   show that the separate existence of each one should be disregarded. This Order
8   also refers to Chicago Title as a single entity, as the Complaint does. But in fact, it
9   is two entities: Chicago Title Company, a California corporation, and Chicago Title
10  Insurance Company, a Florida corporation. (Compl., ¶¶ 21–23.) Plaintiffs
11  summarily allege that the two are "agents, alter egos, and instrumentalities of one
12  another," based on their common ownership, sharing of the same officers, use of
13  the same or interconnected websites, and coordinated operation. (*Id.*, ¶ 23.)
14  Plaintiffs also generally allege that all Defendants are the "agents, employees, joint
15  venturers, partners, alter egos, or successors in interest of the other Defendants .
16  . . ." (*Id.*, ¶ 30.) The facts to support DuCharme's and Elixman's agency for Chicago
17  Title are pled. (*Id.*, ¶ 9.) But Defendants Torres, Rachael Bond, and Joelle Hanson,
18  are alleged to have been employees of ANI. (*Id.*, ¶¶ 27–29.) How they came to
19  act as Chicago Title's agents, or Chicago Title as their agent, is not well explained.
20  Generalized and conclusory allegations of agency or joint venture unsupported by
21  facts are insufficient. *See Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025
22  n.5 (9th Cir. 2017) (citing *Iqbal*, 556 U.S. at 678) (rejecting as insufficient plaintiff's
23  conclusory allegations that defendants were each other's agents and were
24  responsible for each other's acts).

25  Chicago Title also argues that while Plaintiffs allege misrepresentations to
26  other investors, they do not specifically identify any misrepresentations
27  to them. The Court has reviewed the Complaint and finds that at least some
28  / / /

misrepresentations are alleged with particularity, even if the entity making the representation is not properly identified.

Plaintiffs allege that Chicago Title described the accounts as escrow accounts, knowing that they were not. (Compl., ¶¶ 12, 70–73.) Because Elixman and DuCharme are alleged to have been acting as Chicago Title's employees at the time, their knowledge — including knowledge of what Champion-Cain was doing — can plausibly be imputed to Chicago Title. (*See id.*, ¶¶ 77–80.) The Complaint plausibly alleges that they were not acting adversely to Chicago Title, but rather that Chicago Title was complicit because it was earning fees. (*Id.*, ¶¶ 14–15, 96.) Although the Complaint does not allege specific occasions when Chicago Title, through its employees, described the accounts as escrow accounts, it is clear this was done repeatedly and over time, including October 18, 2018, when Plaintiffs invested their money in the Lending Platform. (*Id.*, ¶¶ 20.)

Plaintiffs allege that Champion-Cain made certain misrepresentations to "investors," which may include them, though it does not identify when or where she communicated with them. (*Id.*, ¶ 43.) They also allege that Defendants Hanson, Torres, and Bond made other representations, without alleging what was said to them, when, or where. (*See, e.g., id.*, ¶ 47.) While some dates are given, they pertain to statements made to others, not Plaintiffs.

Some other acts in furtherance of the fraud are pled with particularity, especially DuCharme's signing of falsified Form Escrow Agreements in San Diego on February 1, 2017 (*id.*, ¶ 81) and DuCharme's and Elixman's acceptance of bribes (*id.*, 118 (RICO predicate acts)), though many of these occurred well before Plaintiffs invested and are thus not likely to have amounted to a fraud on Plaintiffs.

In sum, the only misrepresentation pled with nearly enough particularity is Chicago Title's representation to Plaintiffs that their money would go into an escrow account made around October 18, 2018. Which entity "Chicago Title" refers to is not adequately pled, though because most events occurred in California it

19cv2129

appears Chicago Title Company is the referenced entity. Still, it is Plaintiffs' obligation to allege sufficient facts to satisfy the pleading standard.

**Other Claims**

Chicago Title argues that Plaintiffs cannot state a claim for breach of fiduciary duty or negligence because it owed no duty to them. Chicago Title also maintains that the negligence claim is merely a restatement of the breach of fiduciary duty claim. The case it cites, *Jafari v. F.D.I.C.*, 2 F. Supp. 3d 1125, 1129–33 (S.D. Cal., 2014), held that because the FDIC was not a party to the escrow agreement, the escrow company owed it no fiduciary duty. Only parties who submit instructions to escrow are considered parties to it. *Id.* at 1133.

The Complaint can fairly be construed as alleging that Plaintiffs gave their money to Chicago Title with the understanding that it would be put into an escrow account. Although no escrow agreement was provided, or quoted, some of the terms were summarized. (*See, e.g.,* Compl., ¶ 64.) After each individual transaction was completed, Plaintiffs should have had the option to either withdraw or reinvest the money, which would have required them to give instructions to Chicago Title either directly or through an intermediary. Other than that, the money was to remain in the account. Plaintiffs also allege that they were listed as third-party beneficiaries of the escrow. (*Id.*)

The Court finds that the Complaint includes enough factual allegations that it is at least plausible that Chicago Title owed Plaintiffs a fiduciary duty in connection with the escrow agreement.

To the extent the negligence claim relies on the breach of fiduciary duty claim, it too survives. That being said, the Complaint alleges numerous other acts by all Defendants that could be actionable as breach of the ordinary duty of care. For example, it alleges Chicago Title allowed Champion-Cain to take investors' funds held on account with Chicago Title — including Plaintiffs' own money — for her own use, even though it knew she had no right to do so. (*Id.*, ¶¶ 73, 87.)

Plaintiffs also appear to rely on negligence as an alternative theory if their fraud claim against Chicago Title does not succeed. Even if Chicago Title did not actually know its employees were accepting bribes and helping Champion-Cain defraud Plaintiffs and other investors, it had a duty to take reasonable steps to detect and correct such misbehavior. (*Id.*, ¶¶ 91–93.)

**Continuing Jurisdiction**

The complaint relies on federal question jurisdiction, based on the two RICO claims, and supplemental jurisdiction as to the state law claims. The parties are not completely diverse. Although this is a putative class action, it does not rely on jurisdiction under the Class Action Fairness Act (CAFA), and it is questionable whether the requirements for CAFA jurisdiction are present here.

With the dismissal of the two federal claims, however, that jurisdictional basis disappears. While the Court's continued exercise of supplemental jurisdiction over state law claims is discretionary under 28 U.S.C. § 1367(c), the Supreme Court has made clear that when federal claims are dismissed before trial, supplemental state law claims should ordinarily be dismissed as well. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (describing this as the rule to be followed in the usual case, even though it is not mandatory).

**Conclusion and Order**

The motion to dismiss claims against Torres is **GRANTED**. Plaintiffs' individual claims are **DISMISSED WITH PREJUDICE**, and putative class claims are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs and Torres shall each bear their own costs and attorney's fees.

The motions to dismiss are **GRANTED IN PART**. The RICO claims (first and second causes of action) are **DISMISSED WITHOUT LEAVE TO AMEND**. The fraud claims (third and fourth causes of action) are **DISMISSED WITHOUT PREJUDICE**. As to the claims for breach of fiduciary duty and negligence (fifth and sixth causes of action, respectively).

19cv2129

Although ANI is a necessary party, dismissal is not required. Rather, this issue can be addressed by means of a temporary stay while the case is still in the pleading stage. The requests to dismiss for failure to join a necessary party are **DENIED**.

DuCharme's motion to stay is **DENIED AS MOOT**.

In light of this order, and in light of developments in case 19cv1628 and other related cases, Plaintiffs are at a crossroads. They may wish to amend their complaint in this case, which would entail either adding allegations to salvage their fraud claims or abandoning those claims. If they were to amend, this case would then be temporarily stayed. After the Court rules on the receiver's motion for authorization to bring claims against Chicago Title, it would then decide whether to extend the stay. On the other hand, Plaintiffs might prefer not to amend at this time, but instead to agree to a short-term stay until the Court rules on the receiver's motion. Finally, Plaintiffs may wish to dismiss their complaint.

Within __21 calendar days of the date this order is issued__, Plaintiffs shall either file an amended complaint correcting the defects this order has identified, or else file a notice stating that they will wait to amend until after the stay is over. After they file either of these, the case will be temporarily stayed. Alternatively, they may file either an *ex parte* or joint motion for dismissal.

**IT IS SO ORDERED**.

Dated:  September 23, 2020

Honorable Larry Alan Burns
Chief United States District Judge

16

19cv2129